IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ANTHONY DALE, | § | |
| | § | |
| Defendant-Below | § | No. 145, 2022 |
| Appellant, | § | |
| | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 1909010294(N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |

Submitted: May 17, 2023
Decided: July 19, 2023

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

## <u>ORDER</u>

This 19th day of July, 2023, after careful consideration of the parties' briefs, the argument of counsel, and the record on appeal, it appears to the Court that:

(1) In December 2021, a Superior Court jury found Anthony Dale guilty on two counts of murder in the first degree and one count of attempted murder in the first degree. After, the court imposed three life sentences, and Dale filed this appeal.

(2) The sole issue on appeal is whether the Superior Court abused its discretion when it denied Dale's motion to exclude the expert opinion of a neurologist on the grounds that it was irrelevant and unreliable.[1] We have concluded

---

[1] *See State v. Dale*, 2021 WL 5232344 (Del. Super. Ct. Nov. 10, 2021).

that the Superior Court did not abuse its discretion and therefore affirm Dale's convictions. A brief recitation of the relevant background facts and the reasons for our decision follows.

(3) Three armed men walked into the Printz Market on June 7, 2013, shot two employees, and left with $200–$300 in cash from the store's register. The first employee, Behk Suh, was working the check-out counter when the men walked in. He was immediately shot in the stomach and arm. The second employee, Anthony "Tone" Berry, was working the deli counter when he was shot in the abdomen and jaw. Berry died from internal bleeding. Suh lost two organs and some function in his left arm.

(4) Officers searching the store in the aftermath of the crime discovered a .22-caliber shell casing behind the deli counter and three .40-caliber shell casings near the cash register.

(5) Two weeks later Dale was found by police alone in a car with a loaded .22-caliber Bersa handgun on the floor. Dale was arrested for possession of the firearm, after which he told the police that his cousin, Maleke Brittingham, had borrowed the weapon and was involved in a shooting at the Printz Market earlier that month. This prompted the police to obtain search warrants to obtain Dale's and Brittingham's DNA and to search their residences.

(6)    The searches were designed to uncover "anything that would pertain to [the Printz Market murder/robbery investigation], clothing worn by the suspects, [or] currency that was taken from the robbery."[2]  But nothing of evidentiary value was uncovered, and the case went cold for the next five years.

(7)    In a January 2014 unrelated investigation, detectives for the New Castle County Police Department ("NCCPD") questioned Dale for more than four hours about his involvement in and knowledge about various shootings.  This interview was video-recorded.

(8)    In early June 2018, officers at the Wilmington Police Department ("WPD") interviewed Indi Islam, believed to be Dale's girlfriend back in 2013.  In due course, Islam told the investigators that she acted as the getaway driver during the 2013 Printz Market robbery for Dale, Brittingham and Jermaine Goines, all of whom entered the market.

(9)    Dale and Brittingham were indicted on two counts of murder in the first degree[3] and one count of attempted murder.[4]

(10)    The State disclosed its intent to call two experts to testify on its behalf at Dale's trial.  One was a senior firearms and toolmarks examiner for the Delaware

---

[2] App. to Opening Br. at A970.
[3] One count for intentionally causing Berry's death and the other for recklessly causing his death during the commission of a felony.  *See id.* at A18–19.
[4] For attempting to cause the death of Bhek Suh.  *See id.*  Goines died before charges were filed, leaving only Dale and Brittingham as co-defendants.  *See also id.* at A70, A86.

3

State Police, who would testify that the .22-caliber Bersa handgun seized from Dale on June 19, 2013, was the same gun that had fired the .22-caliber shell casing discovered near Berry's body. The other was Steven M. Bojarski, M.D., an experienced neurologist with licenses to practice medicine in five-states, including Delaware, who reviewed surveillance footage from the Printz Market and concluded that Berry's shooter favored his left arm in a manner consistent with an injury that Dale sustained to his right arm in 2011.

(11)   The State had provided Dr. Bojarski with a surveillance video that captured glimpses of the robbery/homicide at the Printz Market, Dale's medical records relating to a gunshot wound Dale had suffered in 2011, and the video from the 2014 NCCPD interview. The State then asked Dr. Bojarski if he could offer an opinion that one of the individuals depicted in the surveillance video "displays the same type of disability"[5] as the person in the police interview and as described in Dale's medical records.

(12)   In the report written in response to this inquiry and which the State provided to Dale in accordance with its discovery obligations, Dr. Bojarski recited various facts and stated his opinions to a reasonable medical probability. From his review of the medical records following Dale's 2011 gunshot wound, Dr. Bojarski opined that the area around the wound—"in the right biceps lateral to the humerus

---

[5] *Id*. at A153.

at the mid humerus shaft"[6]—and the notation of a possible bone fracture—was "consistent with a radial nerve injury."[7] Having observed Dale's "upper extremity movements in both arms"[8] during the 2014 NCCPD interview, Dr. Bojarski noted that Dale "displayed a right sided wrist drop,"[9] a symptom associated with a radial nerve injury. And finally, he noted that the individual depicted in the surveillance video, who was holding the gun in his left hand, "exhibit[ed] right upper common extremity weakness[,] which could be consistent with a radial nerve injury at the radial groove."[10]

(13) Dale moved to exclude Dr. Bojarski's expert opinions on four grounds. First, Dale contended that Dr. Bojarski's failure to employ standard diagnostic techniques rendered his "opinion about Mr. Dale's radial nerve injury"[11] unreliable. Second, according to Dale, Dr. Bojarski's observation of the 2014 police interrogation provided inadequate foundation for his conclusion regarding the status of Dale's radial nerve. Third, Dale challenged the reliability of Dr. Bojarski's determination that the suspect in the surveillance video exhibited symptoms consistent with the presence of a radial nerve injury at the radial groove. Fourth, Dale argued that the evidence of the 2011 gunshot wound and the 2014 interrogation

---

[6] *Id*. at A158.
[7] *Id*.
[8] *Id*.
[9] *Id*.
[10] *Id*.
[11] *Id*. at A94.

was inadmissible character evidence the probative value of which was outweighed by the danger of prejudice.

(14) The Superior Court held a pretrial *Daubert*[12] hearing to aid its determination whether Dr. Bojarski's opinions were admissible under Rule 702 of the Delaware Rules of Evidence. That rule, which governs expert-witness testimony, provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)   the testimony is based on sufficient facts or data;
>
> (c)   the testimony is the product of reliable principles and methods; and
>
> (d)   the expert has reliably applied the principles and methods to the facts of the case.

(15) Dale did not contend that Dr. Bojarski was not a qualified medical expert witness by knowledge, skill, experience, training, and education. Dale's principal concern centered on the reliability of Dr. Bojarski's opinions in the absence of an in-person clinical examination.

(16) Dr. Bojarski's testimony at the *Daubert* hearing largely mirrored the content of his expert report. When asked how he diagnosed Dale's injury with a

---

[12] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

"reasonable degree of medical probability," Dr. Bojarski testified that he used the medical records from Dale's 2011 emergency room visit to develop "a working diagnosis" that he "look[ed] to prove or disprove" by observing the symptoms manifested by Dale during his NCCPD interview, explaining that "[h]alf of [neurological] exam[s] . . . [are] based on observation."[13]  He was more equivocal, however, as to whether the subject in the surveillance footage demonstrated an injury consistent with Dale's, stating that the extent of what he could conclude from the footage was that "[the subject] was using his left hand predominantly" and demonstrated a "right upper extrem[it]y [that] was weak, but [] wasn't paralyzed."[14]

(17)   The Superior Court issued a letter opinion and order on November 10, 2021, finding Dr. Bojarski's testimony relevant and reliable and denying Dale's motion.  The testimony was relevant, the court concluded, because,

> *the* central issue [in the State's case] is whether Mr. Dale is the suspected gunman seen in the Printz Market surveillance video.  When viewed carefully, the subject in the surveillance footage presents with hampered movement on his right side.  The abnormal movement and position of the suspect's hand and arm bears remarkable resemblance to symptoms caused by Mr. Dale's previous gunshot injury to his right upper extremity.  To aid in this determination, Dr. Bojarski's testimony is relevant because it will assist the fact finder in understanding the lingering side effects or range of motion limitations resulting from the type of injury [that] Mr. Dale endured.[15]

And the testimony was reliable, the court continued, because,

---

[13] App. to Opening Br. at A324–25.
[14] *Id.* at A319, A321.
[15] *Dale*, 2021 WL 5232344, at *4 (emphasis in original).

[i]n clinical medicine, standard practice of diagnosing a patient and establishing cause is through differential diagnosis. Differential diagnosis refers to the process of determining which affliction the patient is suffering from by means of comparing various competing diagnostic hypotheses with the clinical observations and findings. And the process of differential diagnosis is one tool Dr. Bojarski engages here in deriving his opinion in what is, to be sure, an unusual setting for a physician. But—regarding the review of Mr. Dale's prior medical records and observing his movements in the police interview—it is not uncommon for a physician to reach a reliable diagnosis without himself performing a first-person physical examination. Indeed, consulting physicians regularly arrive at diagnoses by relying on examinations and tests performed by other medical practitioners. On that score, Dr. Bojarski testified that while neurologists do spend a significant amount of time on their patient examinations, half of the exam is based on observation alone.

. . . In other words, Dr. Bojarski did not stray from commonly used and accepted principles, *i.e.*, review of medical records (here supplemented by examination of video footage), to reach his conclusion that the gunman's movements and limitations demonstrated in the Printz Market surveillance video were consistent with that expected from one suffering from a radial nerve injury.[16]

(18) During trial, Islam and Brittingham—both eyewitnesses to the events at the Printz Market—testified as to Dale's involvement in the crime. Islam testified that she drove Dale and two other men to the deli and that they ran back to the car ten minutes later arguing, while Dale held a gun in his lap, "whose bullet hit who."[17] Brittingham stated that he, Dale, and Goins planned the robbery and that, when they entered the deli, Dale shot Berry, Goins shot Suh, and Dale emptied the cash-register. The eyewitness testimony was in addition to the incriminating expert-opinion

---

[16] *Id.* at *5.
[17] App. to Opening Br. at A858.

testimony given by the Delaware State Police's senior firearms and toolmarks examiner that the gun seized from Dale two weeks after the robbery/homicide was the source of the shell-casings discovered near Berry's body.

(19) Dr. Bojarski, in his trial testimony, repeated his belief that, based on Dale's medical records and behavior displayed during the NCCPD interrogation video, Dale suffered from a radial nerve injury at the radial groove. But when asked whether the subject in the Printz Market surveillance footage demonstrated symptoms associated with such an injury, Dr. Bojarski hedged again, stating that because "the film [wa]s going by so fast," all he could say was that the subject "was not using his right side so much" and holding "the handgun [] in [his] left hand."[18]

(20) Dale argues that the Superior Court abused its discretion by admitting Dr. Bojarski's testimony because his medical opinions were not reached through sound methodology. He also contends that, because Dr. Bojarski's trial testimony strayed from the opinions offered in his initial report and at the *Daubert* hearing, it was "misleading"[19] and "no longer relevant."[20] We disagree.

(21) Dale's first argument—that Dr. Bojarski's diagnosis of a radial nerve injury was unreliable because he never conducted an in-person examination of Dale—presents a challenge to the Superior Court's November 10, 2021 pretrial letter

---

[18] *Id.* at A950.
[19] Opening Br. at 6.
[20] *Id.* at 29.

opinion and order. We have carefully considered the opinion and order, the parties' briefs, and the argument of counsel and find no error in the Superior Court's analysis of this issue. As the United States Court of Appeals for the Third Circuit has observed, "[d]epending on the medical condition at issue and on the clinical information already available, a physician may reach a reliable differential diagnosis without himself performing a physical examination, particularly if there are other examination results available. In fact, it is perfectly acceptable, in arriving at a diagnosis, for a physician to rely on examinations and tests performed by other medical practitioners."[21] Here Dr. Bojarski, a seasoned neurologist, was provided with materials—emergency-room medical records from a gunshot wound to the right arm and video of a four-hour police interrogation—sufficient to engage in differential diagnosis. Given the widespread acceptance of differential diagnosis as a sound methodological tool, it was not an abuse of discretion to find Dr. Bojarski's expert-opinion testimony reliable.

(22) Dale's second contention on appeal—that Dr. Bojarski's trial testimony differed from his pretrial disclosures and was thus inadmissible for lack of relevance—was not raised in the Superior Court. It is therefore subject to plain-error review.[22] "Under the plain error standard of review, the error complained of must

---

[21] *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 807 (3d Cir. 1997).
[22] *See Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986) ("Failure to make an objection at trial constitutes a waiver of the defendant's right to raise that issue on appeal, unless the error is plain.").

be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[23] It is limited to "material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[24] This standard is not met here. By backing away from any definitive statement that the symptoms displayed by the subject in the Printz Market surveillance footage were consistent with those associated with a radial nerve injury at the radial groove, Dr. Bojarski's trial testimony was, if anything, more favorable to Dale than what was disclosed in his pretrial report and *Daubert*-hearing testimony and, as such, its admission was not prejudicial to Dale's substantive rights.

(23) Moreover, even if the trial court erred—plainly or otherwise—by failing to strike Dr. Bojarski's testimony once it diverged from his expert report and *Daubert*-hearing testimony, such error was harmless. "Where the evidence exclusive of the improperly admitted evidence is sufficient to sustain a conviction, error in admitting the evidence is harmless."[25] There was more than enough

---

Dale claims to have preserved this issue for appeal by making a pretrial "standing objection" to Dr. Bojarski's testimony. But that objection was, by its nature, based on the grounds stated in Dale's motion to exclude Dr. Bojarski as an expert witness. The argument under consideration here is based on grounds not raised during trial when Dr. Bojarski arguably opined in a manner that was different from the opinions disclosed before trial. Under such circumstances, a motion to strike and request for curative instruction would have been the proper way of allowing the trial judge to address the issue and preserve it for appeal.

[23] *Id.*

[24] *Id.*

[25] *Williams v. State*, 98 A.3d 917, 922 (Del. 2014).

evidence here without Dr. Bojarski's testimony to sustain a conviction, including testimony from two eyewitnesses and a ballistics expert who connected Dale to the murder weapon.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice

12